Eugene ROTTER, Plaintiff,

v.

**CONAM MANAGEMENT CORP., Defendant.**

No. C04–1458L.

United States District Court,
W.D. Washington,
at Seattle.

May 19, 2005.

Artis C. Grant, Jr., Roxanne L. Rarangol, Grant & Associates, Tacoma, WA, for Plaintiff.

Leigh Ann Collings-Tift, Littler Mendelson PC, Seattle, WA, for Defendant.

## ORDER REGARDING MOTION FOR SUMMARY JUDGMENT

LASNIK, District Judge.

## I. INTRODUCTION

This matter comes before the Court on a motion for summary judgment filed by defendant ConAm Management Corporation ("ConAm"). (Dkt.# 11). Plaintiff Eugene Rotter brings this suit against ConAm, his former employer, alleging discrimination based on disability in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"); age discrimination in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"); discrimination on the basis of age and disability in violation of the Washington Law Against Discrimination, RCW 49.60 *et seq.* ("WLAD"); and wrongful termination in violation of public policy.

The Court grants in part and denies in part ConAm's motion for the reasons set forth in this Order.

## II. DISCUSSION

### A. Background Facts.

Plaintiff Eugene Rotter ("Rotter") suffered a cardiac arrest in 1998 and was required to have an implantable defibrillator. In September 1998, he was hired by Pacific Gulf Management as a maintenance technician at the Heatherwood Apartments. In December 1998, ConAm assumed ownership of the apartments and changed their name to Pheasant Run. Rotter submitted an employment application, was hired, and worked for ConAm as a maintenance technician between December 1998 and January 2004. Rotter was fifty-five years old when ConAm hired him.

### 1. Rotter's Employment at Pheasant Run Apartments.

In May 1999, Rotter's physician completed and forwarded to ConAm an Occupational Medical Questionnaire, restricting Rotter from lifting in excess of 50 pounds, repetitive bending and lifting, working at heights, climbing ladders or scaffolds, and working around hazardous equipment or machinery.[1] Rotter alleges that despite his restrictions, he was given work orders requiring him to move washers, dryers, and water heaters, which exceeded his restrictions. Declaration of Eugene Rotter (Dkt.# 24) ("Rotter Decl.") at ¶ 7; Declaration of Sue Morton (Dkt.# 26) ("Morton Decl.") at ¶ 2. Rotter reminded his supervisor, Richard Woolard, about his restrictions, and Woolard stated that he would help him move heavy items. Rotter alleges that no one came to help him, so he had to call his son, Chad Duncan, to assist him. Rotter Decl. at ¶ 10; Declaration of Chad Duncan (Dkt.# 25) ("Duncan Decl.") at

---

1. ConAm alleges that it did not learn that Rotter had any work restrictions until May 1999. Rotter contends that he informed ConAm about his condition and work restrictions when he submitted his employment application and again shortly after he was hired. The factual dispute is not material because Rotter does not allege that ConAm failed to accommodate him in 1998 or 1999.

¶¶ 3, 4. Rotter cites two specific examples of times he was not provided assistance. He alleges that on a Saturday, he received a call from "someone"—presumably a tenant—that a water heater had exploded and she could not reach Woolard, who was on call that weekend. Because "Woolard was not answering his calls," Rotter believed that he "had to deal with replacing the water heater," so he called his son to assist him. Rotter Decl. at ¶ 11. Rotter also alleges that in February 2001, he "was instructed to sprinkle salt on the driveways to melt the ice. [He] was forced to carry a 5–gallon bucket of ice melt, which weighed approximately 75 pounds when it was full." Rotter Decl. at ¶ 9. Rotter slipped on the driveway, broke his ribs, and did not return to full duty until June 2001.

Rotter also alleges that around September 2001, when Woolard was hired as a maintenance supervisor, Woolard made age and disability-based comments to Rotter approximately twice per week, including: "You need to quit working and get 100% disability;" "You need to quit and get on full disability;" and "Why don't you just quit and get full disability?" Rotter Decl. at ¶ 12. Because Woolard believed that Rotter was wasting too much time socializing, he instructed Rotter not to talk to any of the employees, residents, or vendors. Rotter Dep. at 43; Rotter Decl. ¶ 14. Woolard also "yelled at" Rotter, accusing him of not doing his work, and assigned more arduous work to Rotter and to a fifty-four-year-old technician. Another employee observed that Woolard assigned additional work to Rotter while younger workers sat around doing nothing. Morton Decl. at ¶ 7. Rotter complained about Woolard's behavior to Agne Elliot, the apartment manager, but the harassment continued. Rotter Dep. at 43–44; Rotter Decl. at ¶ 13.

In May 2002, Woolard complained to Fran Billings, Vice President of ConAm, that Rotter was wasting time, talking too much with vendors and coworkers, being disrespectful, and calling his supervisor "boy." Billings Dep. at 24. Rotter contends that he initiated the contact with Billings in May 2002 to complain about Woolard. Rotter Decl. at ¶ 13. When Rotter referenced ConAm's discrimination policy, Billings responded, "That policy means nothing to me." *Id.* Billings denies that this conversation occurred or that she ever received a complaint of discrimination from Rotter. Billings Dep. at 23–25. Rotter alleges that he requested a transfer away from Woolard because of the harassment; ConAm counters that he complained of a personality conflict, not harassment. Rotter was subsequently transferred to work at ConAm's Hampton Bay apartments.

## 2. Rotter's Employment at Hampton Bay Apartments.

Rotter alleges that he continued to experience harassment based on his age and disability after his transfer to the Hampton Bay apartments. Rotter states that Sonny Brands, a forty-two-year-old maintenance supervisor, made the following comments to him: "You need to see if you can get disability and quit working," and "You need to get out of this, see if you can get disability or social security." Rotter Decl. at ¶ 17. Rotter alleges that he complained about Brands' comments to Rosilee Hernandez, the apartment manager. Although Hernandez promised to address the issue, the harassment continued until Brands left Hampton Bay around February 2003. Jesus Aquino, a new groundskeeper, made the following comments to Rotter: "You can't do anything, why are you here?"; "You are no good here;" "You need to retire;" and "You need to retire and draw disability or social security or

whatever you can get." Rotter Decl. at ¶ 19. Rotter complained to Hernandez again, and to Hernandez's replacement Kim Wilhite, about Aquino's comments. However, Aquino continued to make the comments until Rotter left Hampton Bay.

In April 2002, ConAm informed its employees, including Rotter, that Washington had passed a law requiring maintenance personnel to obtain an electrical training certificate. Rotter informed ConAm that he would not be able to obtain the certificate. ConAm received a note from Rotter's physician stating, "Mr. Rotter can no longer work with anything electrical since he received his defibrillator." Rotter Dep., Ex. 8. ConAm requested clarification, and Rotter's physician noted that Rotter should "avoid arc welding and sources with high amperage." Rotter Dep., Ex. 11.

By November 2002, Rotter was refusing to perform numerous duties of the maintenance technician job; he would not change plugs, work around the pool or spas, work on ladders or on the roof, paint over his head, change linoleum or repair carpets. Rotter Dep. at 73–75, 79, Ex. 15. Although some of the tasks appeared to be within his medical restrictions, ConAm did not require him to perform these tasks. Instead, they changed his title to groundskeeper and assigned him more duties working on the grounds. Rotter alleges that the position change was a demotion. The groundskeeper position included pushing and pulling dumpsters and attaching them to a truck; the dumpsters weighed more than 50 pounds. Although Rotter performed the dumpster work for a while, he was relieved of the duty as soon as he complained that it exceeded his restrictions. Rotter Dep. at 69–71, 93, 143. By February 2003, Rotter was placed back into his regular position performing his usual job duties.

In October 2003, Rotter requested, and was granted, a leave of absence to have his defibrillator replaced. He was given light duty work when he returned to work at the end of October, and was able to work full duty, with his previous restrictions, as of December 1, 2003.

### 3. Rotter's Suspension.

On December 16, 2003, during an audit of storage space at Pheasant Run, it was discovered that Rotter kept a personal, locked storage space on the property, even though he had not worked there in approximately a year and a half. Inside the storage space, Hernandez found supply boxes from the company from whom ConAm ordered supplies, and supplies that were regularly used to "turn" apartments between renters. ConAm's employment policies strictly prohibit removing or borrowing ConAm equipment, supplies, or parts. Hernandez removed the items she believed belonged to ConAm and put them in a separate locked storage space until the issue of ownership was resolved. Hernandez gave Rotter a list of the items that had been moved. Jessica Potter, ConAm's Regional Administrator, discussed the issue with Rotter on several occasions. When questioned about the supplies, Rotter initially said that they belonged to his landlord although he could not remember his landlord's name. On December 26, 2003, Ms. Potter wrote Rotter a letter noting that ConAm was concerned that he had used the storage space without permission or payment since his transfer in June 2002 and had stored ConAm supplies in the space. Ms. Potter informed Rotter that he was required to remove his items from the storage space and provide receipts for the supplies by January 9, 2004. The deadline was extended, but Rotter continued to refuse to provide proof of ownership or any additional information. Although Rotter knew that he was expect-

ed to discuss the ownership issue with ConAm management, he refused to do so because he "just didn't want to deal with the problem." Rotter Dep. at 123; *see also* Rotter Dep. at 115, 139.

On January 19, 2004, Ms. Potter informed Rotter in a letter that he was suspended for refusing to cooperate with the investigation, and he had ten days to provide receipts for the supplies that were found in his locked storage space. Rotter Dep., Ex. 25. Rotter did not provide receipts or contact Ms. Potter. On January 30, 2004, Rotter filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging that he had been constructively discharged.

## B.  Summary Judgment Standard.

Summary judgment is proper if the moving party shows that "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Once a defendant who is seeking summary judgment has demonstrated the absence of a genuine issue of fact as to one or more of the essential elements of the plaintiff's claims, the plaintiff must make an affirmative showing on all matters placed at issue by the motion as to which the plaintiff has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation Fed.R.Civ.P. 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("When the moving party has carried its burden under Rule 56(c), its oppo-

nent must do more than simply show that there is some metaphysical doubt as to the material facts").

## C.  Disability Discrimination.

### 1.  Disability Under the ADA.

ConAm concedes that Rotter is disabled under the WLAD, but argues that he is not disabled under the ADA. A "disability" under the ADA is a physical or mental impairment that substantially limits one or more of an individual's major life activities. 42 U.S.C. § 12102(2). "To qualify as disabled, a claimant must further show that the limitation on the major life activity is 'substantial.'" *See Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 195–97, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) (noting that the regulations instruct courts to consider the nature and severity of the impairment, its duration or expected duration, and the actual or expected permanent or long-term impact).

■  Plaintiff alleges that he is limited in the major life activity of working, so he must raise a genuine issue of material fact as to whether his condition "significantly restrict[s] his ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person...." 29 C.F.R. § 1630.2(j)(3)(i). Plaintiff simply lists his physical restrictions, notes his cardiac condition, then concludes that he was unable to perform a broad range or class of jobs. Plaintiff falls well short of his burden. He has presented no vocational evidence to support his conclusion. Most significantly, Rotter has not identified *which* range or class of jobs he is unable to perform.

■  Finally, plaintiff alleges that even if he is not disabled under the ADA, he nevertheless can pursue ADA claims because ConAm regarded him as disabled. A person is regarded as disabled if his or her employer mistakenly believes that the person has an impairment that substantial-

ly limits one or more life activities, or mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. *See, e.g., Coons v. U.S. Dept. of Treasury,* 383 F.3d 879, 886 (9th Cir.2004). Plaintiff argues that Billings "willingly admits [he] is disabled under the ADA." Plaintiff's Opposition at 17. In support, plaintiff cites to an e-mail from Billings regarding the storage locker; the first line of the e-mail states, "Eugene Rotter is assistant maintenance at Hampton Bay. He is ADA and in the past has complained to Chris that I have been discriminatory." Declaration of Roxanne L. Rarangol (Dkt.# 23) ("Rarangol Decl."), Ex. 8. Rotter presents no evidence regarding what Billings meant by the brief reference or that she regarded him as disabled as defined by the statute. For these reasons, the Court finds that Rotter was not disabled for purposes of the ADA.

## 2. Failure to Accommodate.

■ An accommodation claim under the WLAD presents the issue of "whether the employer met its affirmative obligation to reasonably accommodate the handicap." *Pulcino v. Federal Express Corp.,* 141 Wash.2d 629, 640, 9 P.3d 787 (2000). It is undisputed that ConAm provided Rotter with various accommodations during his employment, including excusing him from performing some tasks, time off, and light duty work.

Rotter contends that he received work orders requiring him to move washers, dryers, and water heaters, but ConAm failed to provide him the promised assistance. In his deposition, however, Rotter admitted that he was provided assistance for tasks outside his restrictions, including moving appliances. Rotter Dep. at 29, 41–42, 49–50. He cannot create an issue of fact by submitting a declaration that contradicts his unambiguous deposition testimony. *See, e.g., Marshall v. AC & S Inc.,* 56 Wash.App. 181, 185, 782 P.2d 1107 (1989). Regardless, Rotter has not shown that he was *required* to work outside his restrictions. Instead, it appears that he chose to complete certain tasks himself, or with his son, rather than requesting or waiting for company assistance.[2]

Similarly, Rotter alleges that after his transfer, his job duties included pushing and pulling heavy dumpsters. Although Rotter was restricted from *lifting* anything over fifty pounds, he was not restricted from pushing or pulling until November 2002. *See* Rarangol Decl., Ex. 16 (Rotter "cannot lift or maneuver anything weighing more than 50 pounds"). A few days after receiving the maneuvering restriction, Rotter complained about the dumpsters. Rotter admits that as soon as he complained, ConAm informed him that he was not required to move the dumpsters and he never did so again.[3] Accordingly,

---

**2.** This case is factually similar to *Anica v. Wal–Mart Stores, Inc.,* 120 Wash.App. 481, 488, 84 P.3d 1231 (2004), in which the plaintiff alleged that Wal–Mart kept her in a position with duties that forced her to violate her restrictions, even though the employer was aware of the restrictions. The *Anica* court noted, "But Anica herself admitted that when she returned to work, Wal–Mart managers instructed her to not exceed her limitations. Wal–Mart did not have a further responsibility to accommodate Anica until she gave sufficient notice of her need for further accommodation." *Anica,* 120 Wash.App. at 490, 84

P.3d 1231 (affirming summary judgment). This pronouncement is consistent with the general requirement that an employee must provide notice of his or her limitations and cooperate with the employer regarding accommodations. *See generally Goodman v. Boeing,* 127 Wash.2d 401, 408–09, 899 P.2d 1265 (1995).

**3.** Although plaintiff's opposition memorandum states that Rotter "was not taken off dumpsters until one month" after he complained, Rotter repeatedly stated in his deposition that he was taken off dumpsters as soon

Rotter has not shown a dispute of fact regarding whether he was denied any medically necessary accommodations.

### 3. Termination.

When considering a discrimination claim pursuant to the WLAD, Washington courts utilize the *McDonnell Douglas* burden-shifting method. *Hill v. BCTI Income Fund–I*, 144 Wash.2d 172, 180, 23 P.3d 440 (2001) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Under the *McDonnell Douglas* protocol, once the plaintiff sets forth a prima facie case of unlawful discrimination and the defendant produces admissible evidence of a legitimate, nondiscriminatory explanation, then the burden shifts back to the plaintiff who must produce evidence that the defendant's proffered reason for the adverse action was pretextual. *Id.* at 185–86, 23 P.3d 440; *see also Anica*, 120 Wash.App. at 488, 84 P.3d 1231 (plaintiff must provide some evidence that his or her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination).[4]

■ Rotter alleges that he was discharged because of his disability. As an initial matter, ConAm alleges that Rotter was not discharged, but instead chose to seek unemployment benefits rather than cooperate with the company's investigation into the storage issue. The Court finds that even if Rotter was discharged, it did not occur under circumstances raising an inference of discrimination. Plaintiff was not replaced by a younger or non-disabled worker, and none of the decisionmakers made derogatory remarks about his age or

disability status. Instead, plaintiff alleges an inference is supported by the fact that he had a history of complaining about age and disability-based harassment and of requesting accommodations, including a brief leave in October 2003 to replace his defibrillator. He was suspended just two months later. The timing of Rotter's suspension, however, is insufficient to meet his burden. "[C]oincidence is not proof of causation." *Anica*, 120 Wash.App. at 489, 84 P.3d 1231 (affirming grant of summary judgment; fact that plaintiff was discharged a few days after disability-related leave was not proof of causation). As the *Anica* court noted, a plaintiff's history of requesting accommodations can undermine an inference of discrimination if the employer did not discharge the employee after previous accommodation requests. *Id.* at 489, 84 P.3d 1231. In this case, assuming the facts as alleged by plaintiff, ConAm knew of his medical condition and restrictions when they hired him, and they continued to employ him and provide various accommodations throughout his employment. These facts undermine any inference of discriminatory motive.

Plaintiff also contends that the reason for his discharge was a pretext for discrimination because the company knew he kept the storage unit. Rotter has presented no evidence to counter ConAm's assertion that it did not know that Rotter kept company property in the storage space until December 2003. Moreover, he readily admits that he refused to cooperate in the investigation. Finally, plaintiff has provided no evidence that other employees did anything similar but were treated differently.

as he complained. Plaintiff's Opposition at 4; Rotter Dep. at 69–71, 76, 93, 143.

**4.** Plaintiff's opposition does not allege that Rotter's demotion was discriminatory. Even if it had, ConAm has provided a legitimate

non-discriminatory reason, that the grounds position was more consistent with Rotter's restrictions, and Rotter has not rebutted that reason or provided any evidence to raise an inference of discrimination.

For the foregoing reasons, the Court finds that Rotter has failed to identify a genuine issue of material fact regarding his disability discrimination claim.

### D. Wrongful Termination in Violation of Public Policy.

■ Plaintiff contends that ConAm discharged him in violation of public policy because he was exercising his rights to seek reasonable accommodation and to complain about harassment. To establish a claim for wrongful discharge in violation of public policy, a plaintiff must prove three elements: (1) the existence of a clear public policy; (2) that discouraging the conduct in which he or she engaged would jeopardize the public policy; and (3) that the conduct caused the discharge. *See, e.g., Korslund v. Dyncorp Tri–Cities Servs., Inc.,* 121 Wash.App. 295, 318, 88 P.3d 966 (2004). If the employer presents evidence that its conduct was justified, the employee must show that the justification was invalid or pretextual. *See id.*

■ Assuming that a public policy theory is applicable to plaintiff's discrimination claims, plaintiff has not shown the existence of a genuine issue of fact regarding whether he was discharged because of any protected conduct. As set forth above, ConAm has shown that it had a legitimate, non-discriminatory reason for its actions, and Rotter has not provided any evidence of pretext. Accordingly, his public policy claim fails as a matter of law.

### E. Hostile Work Environment.

■ The Washington Supreme Court has recognized a cause of action for a disability-based hostile work environment.

*See Robel v. Roundup Corp.,* 148 Wash.2d 35, 45, 59 P.3d 611 (2002). A plaintiff must prove that (1) he or she was disabled within the meaning of the antidiscrimination statute, (2) the harassment was unwelcome, (3) it was because of disability, (4) it affected the terms and conditions of employment, and (5) it was imputable to the employer. *See id.; see also Glasgow v. Georgia–Pacific Corp.,* 103 Wash.2d 401, 407, 693 P.2d 708 (1985) (when a supervisor or coworkers created the hostile environment, the employee must show that the employer knew or should have known of the harassment and "failed to take reasonably prompt and adequate corrective action").[5] The claim elements are essentially the same for a harassment claim under the ADEA. *See, e.g., Sischo–Nownejad v. Merced Cmty. Coll. Dist.,* 934 F.2d 1104, 1109 (9th Cir.1991) (recognizing age harassment claim under the ADEA).

■ In this case, ConAm disputes that the harassment affected the terms and conditions of Rotter's employment. This element requires that "the conduct or language complained of was so offensive or pervasive that it could reasonably be expected to alter the conditions of plaintiff's employment." *Robel,* 148 Wash.2d at 45, 59 P.3d 611 (internal citation and quotation omitted). The Court considers the frequency and severity of the discriminatory conduct; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the employee's work performance. *See Washington v. Boeing,* 105 Wash.App. 1, 10, 19 P.3d 1041 (2000) (evaluating sexual harassment claim under the WLAD). "Casual, isolated or trivial man-

---

5. ConAm concedes the first element. Although ConAm implies that Rotter may have invited the comments to some extent by referring to Woolard as "boy" and telling a younger, female employee to "respect her elders," these comments are insufficient to show that the comments made by Woolard, Brands, and Aquino were welcome. Furthermore, although ConAm disputes that Rotter ever complained about the alleged harassment, it acknowledges that the Court must assume he did for purposes of this motion.

ifestations of a discriminatory environment do not affect the terms or conditions of employment to a sufficiently significant degree to violate the law." *Id.*

█ Rotter alleges that he was subjected to a hostile work environment at Pheasant Run based on his age and disability. After Woolard became the maintenance supervisor in September 2001, he informed Rotter at least twice a week that he needed to quit and get on full disability or words to that effect.[6] Rotter felt humiliated. Rotter Decl. at ¶ 12. Woolard also yelled at Rotter for not doing his work and assigned more arduous work to him and to a fifty-four-year-old technician.[7] Although Rotter complained to Elliot and Billings, the harassment continued until he requested a transfer in May 2002 to separate himself from Woolard. Rotter has raised genuine issues of material fact regarding whether the comments and additional work occurred, whether they were offensive enough to create a hostile and abusive environment based on his disability and age, whether he complained, and whether ConAm took reasonably prompt and adequate corrective action. *Robel*, 148 Wash.2d at 47–48, 59 P.3d 611.

█ Rotter also alleges that he experienced a hostile work environment after he transferred to the Hampton Bay apartments, even though he was working with a new set of coworkers and management staff. Brands, who Rotter describes as a maintenance supervisor and ConAm identifies as a lead, told him seven or eight times over a four or five month period to see if he could get disability or social security and quit working; Brands also told Rotter he was "too old for this." Rotter Dep. at 38–39; Rotter Decl. at ¶ 17. Aquino, a groundskeeper, made four or five comments to Rotter over the course of a month, including telling him, "You are no good here." Rotter Dep. at 38–39. Rotter was offended by Brands' and Aquino's comments. Rotter complained to Hernandez, the apartment manager, and to Hernandez's replacement Kim Wilhite, but the comments continued. Although Rotter alleges that he was offended by the comments, he has not shown that a reasonable person would have found the work environment to be abusive and intolerable. Brands' comments occurred during casual conversation and were arguably aimed at advising rather than degrading Rotter. Rotter Dep. at 39. Aquino was a peer and although his comments were objectively offensive, they occurred only four or five times and ended after one month. Most significantly, Rotter does not allege, and there is no evidence, that the conduct interfered with his work performance at Hampton Bay. *See Washington*, 105 Wash. App. at 11, 19 P.3d 1041 (affirming summary judgment where none of the conduct or comments unreasonably affected plain-

---

**6.** ConAm argues that Rotter's current allegations of Brands' and Aquino's harassment are more extensive than the allegations he made during his deposition. The Court considers the contentions as Rotter alleged during his deposition. ConAm also argues that Rotter never testified in his deposition that he complained that Woolard required him to perform more arduous work; however, the provided deposition pages do not show that he was asked questions that should have elicited that testimony. The Court therefore considers Rotter's allegation that Woolard assigned him more arduous work.

**7.** Rotter also alleges that Woolard contributed to the hostile work environment by prohibiting him from talking with employees, residents, or vendors. This allegation does not support Rotter's claim because he does not deny that he was wasting time talking during work hours or allege that others were allowed to do so. Moreover, it appears that Rotter ignored Woolard's directive, and complained to other employees about the no talking rule. Rotter Decl. at ¶ 15.

 

tiff's work performance). Accordingly, Rotter has failed to show that the comments were sufficiently severe and pervasive to alter the terms and conditions of his employment at Hampton Bay.

### III. CONCLUSION

For all of the foregoing reasons, ConAm's motion for summary judgment (Dkt.# 11) is GRANTED IN PART AND DENIED IN PART. Rotter may pursue his age and disability-based hostile work environment claim under the WLAD and the ADEA based on his employment at Pheasant Run while Woolard was his supervisor. The remainder of his claims are dismissed.